IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 21-cv-0023-WJM-NRN

LANCE GREEN, and
ANDERSON KHALID, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

PERRY'S RESTAURANTS LTD, and
PERRY'S STEAKHOUSE OF COLORADO, LLC, collectively d/b/a PERRY'S
STEAKHOUSE AND GRILLE,

      Defendants.

---

ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Before the Court is Plaintiffs' Motion for Partial Summary Judgment ("Motion").

(ECF Nos. 209–212).  Defendants Perry's Restaurants LTD ("PRL") and Perry's

Steakhouse of Colorado, LLC ("PSC") (together, "Defendants") filed a response (ECF

No. 218), to which Plaintiffs filed a reply (ECF Nos. 221–222.)

For the reasons set forth below, the Motion is granted in part and denied part.

## I. BACKGROUND[1]

Perry's Steakhouse and Grille ("Perry's") is an upscale steakhouse with multiple

---

[1] This Background is derived from the parties' briefs on the Motions and documents
submitted in support thereof.  The facts set forth herein are undisputed unless attributed to a
party or source.  All citations to docketed materials are to the page number in the CM/ECF
header, which sometimes differs from a document's internal pagination.

      The Court also notes at the outset that Defendants submitted their summary judgment
evidence as a single, 2,137-page appendix.  (*See* ECF No. 218-1.)  Though the pages of the
appendix are consecutively numbered, Defendants did not pin cite those page numbers in their

locations throughout the United States, including, as pertinent to this lawsuit, locations

in Colorado, North Carolina, Alabama, and Florida (collectively, the "Four Locations").

(ECF No. 209 at 5 ¶ 1; ECF No. 218 at 7 ¶ 1.)  PRL, a Texas entity, is the parent

company of several subsidiary LLCs that directly own the Four Locations—namely,

PSC; Perry's Steakhouse of North Carolina, LLC ("PSNC"); Perry's Steakhouse of

Alabama, LLC ("PSA"); and Perry's Steakhouse of Florida, LLC ("PSF").  (ECF No. 161-

2 at 2.)  The parties dispute the extent to which PRL is involved in the operations of the

Four Locations.  (ECF No. 218 at 17 ¶ 59; ECF No. 221 at 4 ¶ 59.)

Plaintiffs are individuals who worked as servers at one of the Four Locations in at

least one week since January 5, 2018, and who were paid a direct cash subminimum

hourly wage during some or all of their employment.[2]  (ECF No. 209 at 6–7 ¶¶ 4–5; *see

also* ECF No. 205 at 2; ECF No. 242 at 5.)  In this lawsuit, Plaintiffs assert claims

against Defendants for various alleged violations of the Fair Labor Standards Act, 29

U.S.C. § 201, *et seq*. ("FLSA"); the Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-

101, *et seq*. ("CWCA"); and the Colorado Overtime and Minimum Pay Standards Order

---

response brief, instead directing the Court to, e.g., "App. Ex. 6, p. 2–3."  This approach has
made it exceedingly cumbersome for the Court to locate the specific excerpts to which
Defendants wish to direct its attention.  To the extent the parties have occasion to file
voluminous exhibits in the future, they are instructed to *separately* append each exhibit to their
CM/ECF filing.  Any subsequent failure to do so will result in the filing being summarily stricken
with instructions to re-file.

[2] The parties agree that there are at least "[s]everal Plaintiffs [who] earned a direct wage
that was higher than $7.25 per hour at various times during the relevant time period, and thus
they may not recover damages under the FLSA for those weeks."  (ECF No. 221 at 6 ¶ 64; *see
also* ECF No. 218 at 18 ¶ 64.)  Defendants further contend that "[s]everal Plaintiffs were *always*
paid a direct cash hourly wage *above* the FLSA $7.25 per hour standard while employed by a
Location."  (ECF No. 218 at 18 ¶ 64 (first emphasis added).)  Given Plaintiffs' offer to "meet and
confer with Defendants to identify the individuals who Defendant believes meet this criteria" so
that "their FLSA claims may be voluntarily withdrawn," (ECF No. 221 at 27), the Court trusts the
parties will be able to resolve this issue before trial and will not further analyze this issue herein.

#38, 7 CCR 1103-1 ("COMPS Order") (together with the CWCA, the "Colorado Wage Laws").  (ECF No. 235 at 2.)  The instant Motion, however, primarily concerns just one of these alleged violations: Defendants' purported "illegal practice of using tip pool funds . . . to pay the wages of workers who worked shifts when the restaurants were closed, and no customers were present."  (ECF No. 209 at 3.)

Like all Perry's servers, Plaintiffs were required to contribute 4.5% "of all sales credited to or generated by [them]" to a mandatory tip pool.  (ECF No. 209 at 7 ¶ 6; ECF No. 218 at 8 ¶ 6; ECF No. 211-21.)  The tip pool funds were paid out on a weekly basis to other employees working at the same restaurant location in proportion to "the number of hours [each employee] worked in that week" "while clocked in under a position . . . designated as one that received tip pool distributions."  (ECF No. 209 at 7 ¶ 8; ECF No. 168-1 at 2–3 ¶¶ 4, 6.)  Those "tip share job codes" specifically included hosts, food runners, bussers, server assistants, bartenders, and service well bartenders.  (ECF No. 209 at 7 ¶ 11.)

It is undisputed that, to at least some extent, "tip pool monies" were "distributed" to employees in these designated tip share positions even when their shifts were, in whole or in part, "before the advertised opening time of [the Four Locations]."  (ECF No. 209 at 8 ¶¶ 12–13; ECF No. 218 at 9 ¶¶ 12–13, 41; *see also* ECF No. 210-1 at 61:21–23 (defense counsel representing at discovery hearing before Magistrate Judge N. Reid Neureiter that "[Defendants] would not dispute the fact that there's some tip pool recipients who were working at the restaurant before the restaurant opened for guests").)[3]  The current advertised opening and closing times at each of the Four

---

[3] (*See also, e.g.,* ECF No. 211-5 (Perry's "Corporate Operations Specialist," Howard Cortes, clarifying that AM Hosts will "clock in under AM host and collect tipshare from your pm

Locations are specifically as follows:

| Location | Sunday | Mon – Thurs | Friday | Saturday |
|---|---|---|---|---|
| Colorado | Open: 4:00 p.m.<br>Close: 9:00 p.m. | Open: 4:00 p.m.<br>Close: 10:00 p.m. | Open: 10:30 a.m.<br>Close: 10:00 p.m. | Open: 4:00 p.m.<br>Close 10:00 p.m. |
| Alabama | Open: 4:00 p.m.<br>Close: 9:00 p.m. | Open: 4:00 p.m.<br>Close: 10:00 p.m. | Open: 10:30 a.m.<br>Close: 10:00 p.m. | Open: 4:00 p.m.<br>Close: 10:00 p.m. |
| Florida | Open: 4:00 p.m.<br>Close: 9:00 p.m. | Open: 4:00 p.m.<br>Close: 10:00 p.m. | Open: 10:30 a.m.<br>Close: 11:00 p.m. | Open: 4:00 p.m.<br>Close: 11:00 p.m. |
| North Carolina | Open: 4:00 p.m.<br>Close: 9:00 p.m. | Open: 4:00 p.m.<br>Close: 9:00 p.m. | Open: 10:30 a.m.<br>Close: 10:00 p.m. | Open: 4:00 p.m.<br>Close: 10:00 p.m. |

(ECF No. 209 at 6 ¶¶ 2–3; ECF No. 218 at 7 ¶¶ 2–3; ECF No. 218 at 18 ¶ 61; ECF No. 221 at 5 ¶ 61.)[4]  Based on their analysis of the time records Defendants have produced thus far, Plaintiffs submit that there are more than 3,400 instances where an employee clocked-in under a tip share job code before 2:00 p.m. and clocked-out before 5:00 p.m. on the same day, excluding all Friday and holiday shifts when the Four Locations opened earlier for lunch.  (ECF No. 211-24.)[5]

Plaintiffs explain that they chose the "clock-out time of 5:00 pm" for their analysis

_____

shift"); ECF No. 211-14 (Perry's "HR Payroll Manager," Priscilla Ortiz, responding to question about how "tip share works for our new AM Busser position . . . because there is no AM tip share collected" and suggesting to "pull the AM hours from the spreadsheet and enter them into the PM column for that employee").)

[4] In 2020, the Four Locations temporarily closed and re-opened with adjusted advertised opening times to align with local restrictions and/or staff limitations due to the COVID-19 pandemic.  (ECF No. 218 at 18 ¶ 60.)  In addition, the North Carolina location did not open until September 2020.  (ECF No. 218 at 19 ¶ 68.)  With these exceptions, the Court presumes that the opening and closing times summarized in the table above were consistent for each of the Four Locations throughout the relevant time period.

[55] Plaintiffs offer this evidence through the declaration of Muskan Garg, a "Data Analyst," employed by Plaintiffs' counsel's law firm.  (ECF No. 211-24 at ¶ 1.)  Defendants object to Garg's declaration under Fed. R. Evid. 702, Fed. R. Civ. P. 37(c)(1), and on the basis of prejudice.  (ECF No. 218 at 34–35.)  These objections are inapt.  Plaintiffs are proffering Garg's declaration and the list appended thereto as a Rule 1006 summary derived from Perry's *own data* produced in this litigation, and the Court discerns no reason it may not be appropriately considered as such.  (ECF No. 221 at 25.)  To the extent Defendants' believe Garg's declaration is overinclusive for damages purposes, they will have an opportunity to explore that on cross-examination at trial.  For the purposes of this Motion, however, Defendants' objections are overruled.

"because Perry's has produced documents showing that 'Opening Bussers' perform cleaning and similar duties until 4:15 pm, and thus the morning shifts often end shortly after the restaurant opens."  (*Id.* at ¶ 13.)  "Opening Busser" (or "AM Busser") tasks specifically included the following:

| OPENING BUSSER |
| --- |
| 11:00-12:00 Sweep and scrub the floors |
| 12:00-12:45 Polish and restock B&B plates and app plates, silverware |
| 12:45-1:45 Stock server stations: water glasses, linens and silverware in sorters; peroxide cleaner and towels |
| 1:45-2:15 Restock beverage glasses in beverage station |
| 2:15-2:45 Perimeter check-landscaping, parking lot, valet area |
| 2:45-3:05 Clean and set the patio* (if open for the day) |
| 3:05-3:35 Set up and restock beverage, tea, coffe and soda stations |
| 3:35-4:15 Prep butter trays & bread trays; setup & stock bread station |

(ECF No. 210-13 at 1; *see also* ECF No. 210-12 (Colorado Opening Busser Checklist); ECF No. 210-14 (Florida Opening Busser Checklist); ECF No. 210-15 (North Carolina Opening Busser Checklist).)  Opening server assistants ("AM SAs") had substantially similarly tasks as the AM Bussers, at least per the deposition testimony of one Colorado Plaintiff.  (ECF No. 210-8 at 8 (testifying that his "opening server assistant work" included "[p]olishing silverware, mopping the floors, building the tables for dinner, which are all also jobs of the bussers and the food runners," but "not necessarily resetting tables because there are none").)

Further still, "Opening Hosts" (or "AM Hosts") appear to have been required to complete their assigned tasks by 3:00 p.m.—an hour before the restaurant opened to guests at 4:00 p.m.  (ECF No. 211-4 (approving the scheduling of "AM Host shifts" from either "12-3 pm" or "11-3 pm" everyday but Friday).)  AM Hosts were specifically assigned the following tasks:

| OPENING CHECKLIST | |
|---|---|
| ☐ Confirm all reservations*<br>☐ Water all planters outside front door (#30 only)<br>☐ Wipe down all glass in Host area. (Including meat display*) 🖥<br>☐ Wipe down Perry's stanchion sign outside<br>☐ Arrange mint bowls & toothpicks 🖥<br>☐ Sweep front area. Roll out & vacuum mats / carpet<br>☐ Copy map and post in designated areas<br>☐ Calculate walk-in count & inform Manager<br>☐ Gather rose petals<br>☐ Assign Servers to OpenTable | ☐ Print appropriate chits to distribute to Servers & Managers<br>☐ Build reset maps based on Mgr's table assignments<br>☐ Restroom check 🖥<br>☐ Coat Check tags restocked on hangers*<br>☐ Place candles on all tables, open party rooms<br>☐ Make list of VIP/Wine Locker guests, booth availability<br>☐ Prepare Birthday Cards 🖥<br>☐ Prepare shift note cards for Managers<br>☐ Stock peroxide cleaner and towels at stand<br>☐ All Hosts wearing a radio |

(ECF No. 211-2 at 1; *see also* ECF No. 211-4 (setting forth similar list of tasks).) The summary evidence suggests that at least part of the motivation for adding AM Host shifts was to reduce the administrative workload of managers. (ECF No. 211-6 (Alabama management identifying "a huge pile of bills and endless phone calls" as a challenge she faces but adding that "[p]art of this has just been addressed with the addition of an AM host").)

Though these AM Employees substantially (or entirely) completed their shifts before the Four Locations opened to guests, Defendants contend it is not always the case that "no customers were present." For instance, according to Defendants, "[o]f the alleged 3,400 AM shifts, at least 140 shifts occurred while a private lunch party was taking place at one of the Four Locations and thus customers were undoubtedly present." (ECF No. 218 at 21 ¶ 72.) They also note that one of the employees identified by Plaintiffs "worked a double shift" "[o]n numerous occasions," "interacting with customers and providing service throughout the entire day." (*Id.* at 18 ¶ 34.)

Notably, Plaintiffs have not yet verified whether tip share funds were used to pay employee wages in connection with all 3,400 identified AM shifts. (ECF No. 218 at 11 ¶ 20.) Nevertheless, Plaintiffs represent that, through a cross-check of the payroll records Defendants have produced to date, they verified that tip share funds were used to pay

employees for at least some of the 3,400 identified AM shifts.  (ECF No. 211-24 at ¶¶ 19–26; *see also* ECF No. 209 at ¶¶ 23, 31, 35, 36.)

Plaintiffs accordingly ask the Court to grant them partial summary judgment that "Perry's operated an unlawful tip pool in all weeks and at all locations in which AM shift employees were paid using Plaintiffs' tips from the tip pool."  (ECF No. 209 at 32.)  If granted, Plaintiffs state they would "then proceed to prove the full extent of their minimum wage damages and the amount of tips they contributed to the unlawful tip pool" at trial.  (*Id.*)

## II. LEGAL STANDARD

"A motion for summary judgment shall be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *United States v. Dept. of Health & Environment,* --- F.4th ---, 2025 WL 3762652, at *7 (10th Cir. 2025) (quoting Fed. R. Civ. P. 56(a)).  "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."  *Savant Homes, Inc. v. Collins,* 809 F.3d 1133, 1137 (10th Cir. 2016) (quotations omitted in original); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (similar).  "A movant who does not bear the burden of persuasion at trial may satisfy this burden by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim."  *Savant Homes,* 809 F.3d at 1137 (quotations omitted in original).  "The nonmovant must then bring forth 'specific facts showing a genuine issue for trial.'"  *Thao v. Grady County Criminal Justice Authority,* 159 F.4th 1214, 1227 (10th Cir. 2025) (quoting *Garrison v. Gambro, Inc.,* 428 F.3d 933, 935 (10th Cir. 2005) (quotation marks omitted in original)).  "These

facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment." *Thao,* 159 F.4th at 1227.

"A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *E.E.O.C. v. v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184, 1190 (10th Cir. 2000). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "At the summary judgment stage, [courts] must 'review the entire record' in the light most favorable to the nonmoving party." *Id.* (quoting *Seamons v. Snow,* 206 F.3d 1021, 1026 (10th Cir. 2000)).

### III. ANALYSIS

#### A.    PRL's Employer Status

As a threshold matter, the FLSA extends minimum wage protections to "employees of covered employers." *Acosta v. Jani-King of Oklahoma, Inc.,* 905 F.3d 1156, 1159 (10th Cir. 2018) (citing 29 U.S.C. §§ 206(a), 207(a)). Thus, "[a]n employer-employee relationship is a prerequisite to an FLSA claim." *Merrill v. Harris,* 2022 WL 3696669, at *5 (10th Cir. Aug. 26, 2022).

The Court previously found that "no employment relationship exists between PSC and Green or any other putative class member who was not directly employed by PSC" and accordingly dismissed all claims against PSC "to the extent they are brought by Green or any other class member who was not employed at PSC's Colorado location." (ECF No. 59 at 9–11; *see also* ECF No. 221 at 26 ("Plaintiffs agree that claims of non-Colorado Opt-in Plaintiffs against PSC are dismissed.").) As a result, the

8

only remaining issue is whether an employment relationship exists between the non-Colorado Plaintiffs and PRL.  Defendants oppose the Motion partly on the grounds that the non-Colorado Plaintiffs have not established any such employment relationship exists, making summary judgment on their FLSA claims improper.  (ECF No. 218 at 26–28.)[6]  Ultimately, the Court agrees with Defendants that issues of material fact preclude summary judgment on the issue of PRL's employer status—but just barely.

"Whether an entity is an employer within the meaning of the FLSA is a legal question, with subsidiary findings considered issues of fact."  *Sanders v. Glendale Restaurant Concepts, LP,* 2020 WL 5569786, at *3 (D. Colo. Sept. 17, 2020).  The FLSA defines an "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  "Employer" is in turn defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."  *Id.* § 203(d).  And the FLSA "'defines the verb 'employ' expansively to mean 'suffer or permit to work.'"  *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326 (1992) (quoting *id.* § 203(g)).  "The Supreme Court has emphasized that the 'striking breadth' of this latter definition 'stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles.'"  *Baker v. Flint Engineering & Const. Co.,* 137 F.3d 1436, 1440 (10th Cir. 1998) (quoting *Darden,* 503 U.S. at 326).  As a result, "in determining whether an individual is covered by the FLSA, [the Court's]

---

[6] Defendants actually ask, in the first instance, that the Court dismiss the claims of the non-Colorado Plaintiffs.  (ECF No. 218 at 27–28.)  A request for affirmative relief in response to a motion is improper.  *See* D.C.COLO.LCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion.  A motion shall be filed as a separate document.").  In any case, as discussed below, Plaintiffs have marshalled more than enough evidence to create a genuine issue of material fact regarding PRL's employer status.

inquiry is not limited by any contractual terminology or by traditional common law
concepts of 'employee' or 'independent contractor.'" *Baker,* 137 F.3d at 1440 (internal
citation and quotation marks omitted).  "Instead, the economic realities of the
relationship govern . . . ." *Id.*

   The "focal point" of the economic realities test is "whether the individual is
*economically dependent* on the business to which he renders service, or is, as a matter
of economic fact, in business for himself." *Barlow v. C.R. England, Inc.,* 703 F.3d 497,
506 (10th Cir. 2012) (quoting *Doty v. Elias,* 733 F.2d 720, 722–23 (10th Cir. 1984))
(emphasis added in original).  "[C]ourts generally look at (1) the degree of control
exerted by the alleged employer over the worker; (2) the worker's opportunity for profit
or loss; (3) the worker's investment in the business; (4) the permanence of the working
relationship; (5) the degree of skill required to perform the work; and (6) the extent to
which the work is an integral part of the alleged employer's business." *Baker,* 137 F.3d
at 1440.  In addition, courts inquire "into whether the alleged employer has the power to
hire and fire employees, supervises and controls employee work schedules or
conditions of employment, determines the rate and method of payment, and maintains
employment records." *Id.; see also Inniss v. Rocky Mountain Inventory, Inc.,* 385 F.
Supp. 3d 1165, 1168 (D. Colo. 2019) (Martinez, J.) (same); *Fuentes v. Compadres, Inc.,*
2018 WL 1444209, at *5 (D. Colo. Mar. 23, 2018) (considering these four factors
specifically when "[a]pplying the economic realities test to joint employers").  "None of
the factors alone is dispositive; instead, the court must employ a totality-of-the-
circumstances approach." *Baker,* 137 F.3d at 1440.

   Turning to the summary judgment evidence at hand, Plaintiffs append e-mail

communications which suggest that PRL's approval is required to interview and/or extend offers to candidates for open positions, including servers.  (*See, e.g.,* ECF No. 222-13 (seeking approval from David Freeman, PRL's "Senior Vice President, Operations," to "[r]ehire" a candidate for a server position).)  Moreover, with regard to conditions of employment, Plaintiffs contend that PRL created the Employee Handbook that is used at all Perry's restaurant locations.  (*See* ECF No. 172-1 at 1 (listing PRL on the cover page, followed by each of its subsidiary companies); *id.* at 5 (defining "Perry's" and "the Company" as inclusive of PRL *and* subsidiary companies).)  And Plaintiffs further point out that PRL employs a "Director of Training," who PRL's Chief Operations Officer, Richard Henderson, testified at his deposition was responsible for "[p]utting together the documents . . . related to training of all positions," including "side work duty checklists."  (ECF 222-2 at 16.)

With respect to employee rate and method of payment, Plaintiffs contend that PRL is responsible for setting the 4.5% tip share requirement at issue in this lawsuit, as embodied in the Employee Handbook.  (*Id.* at 18–19 ("The Company has set this tip share amount as to servers at the current rate of 4.5% of sales per shift.").)  Plaintiffs' evidence also suggests that PRL's approval was required to effectuate any change in employee pay.  (*See, e.g.,* ECF 222-12 (Senior General Manager at North Carolina Location seeking Freeman's approval of "Employee Payroll Action Sheets (EPAS)" "so that we can streamline tipshare to 12.87 across the board starting next week").)  And Plaintiffs correctly point out that some of Defendants' own summary judgment evidence supports PRL is responsible for maintaining personnel records.  Specifically, Defendants submit the declaration of Gary Gutierrez, PRL's Director of Human

Resources, in which he describes himself as the "custodian of records for the documents and data described in and attached to this Declaration, which are payroll and related personnel records . . . ."  (ECF No. 218-1 at 13–14 ¶ 3.)

Defendants, for their part, proffer five declarations to refute PRL's employer status: one from Henderson (PRL's COO); and one from a General Manager and/or Senior General Manager at each of the Four Locations.  (*See generally* ECF No. 218-1.)  Before examining these declarations, the Court makes the threshold observation that much of Defendants' argument and evidence centers on the level of control allegedly exercised by PSC, PSA, PSF, and PSNC over the employees at the Four Locations.  (ECF No. 218 at 27.)  However, the fact that Plaintiffs may have an employee-employer relationship with the subsidiary entities that directly own each of the Four Locations does not necessarily mean that Plaintiffs do not *also* have an employee-employer relationship with PRL.  "Separate persons or entities that share control over an individual worker may be deemed joint employers under the FLSA."  *Frost v. Medicine Man Techs., Inc.,* 2025 WL 605259, at *8 (D. Colo. Feb. 25, 2025) (quoting *Barnett v. Vapor Maven OK 1, LLC,* 2022 WL 16950273, at *2 (N.D. Okla. Nov. 15, 2022)), *report and recommendation adopted* Civil Action No. 1:23-cv-2607-GPG-TPO, ECF No. 75.  Thus, "[a]n employee may have more than one employer responsible for the FLSA provisions."  *Mason v. Miro Jewelers, Inc.,* 2020 WL 6828015, at *2 (D. Colo. Mar. 17, 2020).  Such "[j]oint employers are held, *individually and jointly*, to FLSA compliance."  *Frost,* 2025 WL 605259, at *8 (emphasis added).  Accordingly, if the economic realities test is satisfied as to PRL, it is of no import that "the Alabama, Florida, and North Carolina entities are notably absent as Defendants in this case."

(ECF No. 218 at 27.)

Nevertheless, Henderson states that "[t]he only action PRL has taken with

respect to the Four Locations is to submit, from Texas to a governmental agency in the

respective states of Colorado, Alabama, Florida, and North Carolina, appropriate

registration papers establishing the Four Locations as entities authorized to conduct

business in its state."  (*Id.* at 2 ¶ 9.)  "From that moment," he continues, "PSC, PSA,

PSF, and PSNC has each served as its own and only sole operator."  (*Id.*)  Thus,

according to Henderson,

> PRL is not the employer of any server who works at any of
> the Four Locations . . . .  PRL is not involved in any day-to-
> day core operations of any of the Four Locations, does not
> hire or fire any of their servers, does not train their servers,
> does not oversee how their servers check out their sales and
> tip calculations, does not control the work schedules or
> assignments of their servers, does not control side work
> assignments or other work assignments or any equivalent
> job duties, does not participate in calculating tip share or tip
> pool job distributions, and does not enforce any disciplinary
> action or other day-to-day oversight of servers who work at
> any of these Four Locations, whether pertaining to tip
> pooling, tip sharing, side work, deductions for uniforms or
> tools and equipment, or any other such matters.

(ECF No. 218-1 at 4 ¶ 4.)  Each of the General Managers of the Four Locations in turn

generally corroborates in their declaration that they possess the supervisory authority

over the employees at their respective location that PRL purports to lack.  (ECF No.

218-1 at 7–11, 2119–37.)

Though Plaintiffs have not raised any specific objection to these declarations, the

Court has some concern that the portions directed at refuting PRL's employer status

represent little more than conclusory, lawyer-drafted language designed to manufacture

a genuine dispute of fact.  The Court's suspicion is partly attributable to the fact that

relevant portions of the declarations are nearly, if not completely, identical, (*compare,*

*e.g.,* 218-1 at 7 ¶ 5 *with id.* at 2120 ¶ 4 and *id.* at 2126 ¶ 5 and *id.* at 2133 ¶ 3), and

none are supported by corroborating documentary evidence.

But, as this Court has previously observed,

> [t]he Tenth Circuit has stated that a court cannot necessarily
> reject a declaration out-of-hand as "self-serving."  *Vreeland
> v. Schwartz*, 2021 WL 2946465, at *5 (10th Cir. July 14,
> 2021).  Rather, when a declaration is "based upon personal
> knowledge and sets forth facts that would be admissible in
> evidence, it is legally competent to oppose summary
> judgment, irrespective of its self-serving nature."  *Id.* (quoting
> *Sanchez v. Vilsack*, 695 F.3d 1174, 1180 n.4 (10th Cir.
> 2012) (brackets, citation, and internal quotation marks
> omitted in *Vreeland*)).  Moreover, the Tenth Circuit has found
> that the mere fact that a declaration is "uncorrob[or]ated" is,
> on its own, insufficient to grant summary judgment in a
> [moving party's] favor.  *Id.*  And on summary judgment, a
> district court may not weigh the credibility of witnesses.  *Id.*
> (citing *Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir.
> 2008)).

*Bocanegra v. Arepas House, LLC,* 2023 WL 4297575, at *4 (D. Colo. June 30, 2023).

For similar reasons here, the Court concludes that the declarations contain *just*

enough factual content that it would be inappropriate to discount them as competent

summary judgment evidence.  As a result, it necessarily also finds that the averments of

PRL's COO and the General Managers refuting PRL's degree of supervisory control

over the individual employees at the Four Locations is sufficient to create a genuine

dispute of fact—if only just so.

The Motion is thus denied to the extent Plaintiffs ask the Court to fully resolve the

issue of PRL's liability under the FLSA, as PRL's employer status remains a disputed

issue of fact to be resolved at trial.[7]

---

[7] Intertwined with Defendants' argument as to PRL's alleged lack of employer status are

B.    **Inclusion of AM Employees in the Tip Pool**

The Court turns next to the primary merits issue raised by the Motion: that

Perry's violated the tip credit by using "the tip pool to pay AM employees who were

working when the restaurant was closed, and no customers were present."  (ECF No.

209 at 20.)

Both the FLSA and Colorado Wage Laws include special provisions concerning

the payment of "[t]ipped employee[s]"—that is, "any employee engaged in an

occupation in which he customarily and regularly receives more than $30 a month in

tips."  29 U.S.C. § 203(t); COMPS Order, 7 CCR 1103-1 at § 1.10.  In particular, each

contains a "tip-credit provision" permitting employers to pay their tipped employees "a

cash wage of as little as $2.13 an hour," under the FLSA, or $9.30 an hour, under the

Colorado Wage Laws, "and then use a portion of the employees' tips to make up the

difference between the hourly cash wage and the [statutory] minimum wage."  *Romero*

*v. Top-Tier Colo. LLC,* 849 F.3d 1281, 1283-84 (10th Cir. 2017) (citing 29 U.S.C. §

203(m)); COMPS Order, 7 CCR 1103-1 at § 6.2.3.

As a "general rule," "an employer may not claim the tip credit unless a tipped

employee is permitted to retain all of his tips."  *Montano v. Montrose Rest. Assocs., Inc.,*

800 F.3d 186, 188 (5th Cir. 2015) (citing 29 U.S.C. § 203(m)).  This general rule is,

---

various averments regarding personal jurisdiction.  (*See, e.g.,* ECF No. 218 at 27 ("there is no
personal jurisdiction over the Florida and North Carolina locations").)  The Court discerns no
argument that warrants revisiting its discussion of personal jurisdiction in its prior Orders
Denying PRL's Rule 12(b)(3) Motion to Dismiss and Granting in Part and Denying in Part
Defendants' Motion to Decertify the FLSA Collective Action.  (ECF Nos. 59, 205.)  Indeed, apart
from *Bristol-Myers,* the only authority to which Defendants direct the Court is *Green v. Fishbone
Safety Sols., Ltd.,* 2017 WL 4012123, at *1 (D. Colo. Sept. 12, 2017)—a case which is clearly
distinguishable because, unlike here, the defendants' personal jurisdiction challenge was before
the court in accordance with a timely Rule 12(b)(2) motion.

however, subject to a limited exception: An employer may "require an employee to 'pool'
or share tips with other 'employees' so long as those employees 'customarily and
regularly receive tips.'"  *Giuffre v. Marys Lake Lodge, LLC,* 2012 WL 4478806, at *1 (D.
Colo. Sept. 28, 2012) (quoting 29 U.S.C § 203(m)); COMPS Order, 7 CCR 1103-1 at §
1.10 (similar).  So it follows, "[i]f an employee is required to share tips with an employee
who does not customarily and regularly receive tips, the employer may not legally take a
tip credit."  *Montano,* 800 F.3d at 189; COMPS Order, 7 CCR 1103-1, at § 1.10
("Employer-required sharing of tips with employees who do not customarily and
regularly receive tips, . . . shall nullify allowable tip credits towards the minimum wage.").

      Moreover, it is Defendants who have "the burden to demonstrate the propriety of
[their] tip pooling scheme."  *Allsopp v. Akiyama, Inc.,* 2010 WL 1258006, at *5 (D. Colo.
Mar. 26, 2010); *see also Steele v. Leasing Enterprises, Ltd.,* 827 F.3d 237, 242 (5th Cir.
2016) ("The employer carries the burden to prove its entitlement to the tip credit" under
the FLSA.); *Myers v. Copper Cellar Corp.,* 192 F.3d 546, 549 n.4 (6th Cir. 1999) ("[A]n
employer who invokes a statutory exemption from minimum wage liability bears the
burden of providing its qualification for that exemption.").  Thus, the pertinent question is
whether Defendants can "prove that [they] only distributed tip pool funds among
employees who customarily and regularly receive tips."  (ECF No. 209 at 19.)  The
Court agrees with Plaintiffs that they cannot.

      Though it does not appear the Tenth Circuit has yet had occasion to analyze
under what specific circumstances an employee is "customarily and regularly tipped,"
both parties cite the Fifth Circuit's decision in *Montano,* 800 F.3d 186.  *See also Paschal
v. Perry's Restaurants Ltd.,* 2025 WL 596646, at *6–7 (W.D. Tex. Jan. 29, 2025)

(concluding *Montano* was still good law after the Fifth Circuit's decision in *Restaurant Law Center*).  There, the Fifth Circuit held that, "in determining whether an employee customarily and regularly receives tips, a court—or a factfinder—must consider the extent of an employee's customer interaction."  *Montano,* 800 F.3d at 193.  It also instructed that courts should "consider whether the employee is engaging in customer service functions," as "[e]ven an employee who works in the dining room will not be considered a tipped employee if his work is not customer-service oriented," like "an electrician who is repairing a chandelier."  *Id.*  Ultimately, the Fifth Circuit noted that "[d]etermining whether an employee is one who 'customarily and regularly receives tips' is a fact-intensive inquiry that requires a case-by-case analysis of the employee's duties and activities."  *Id.* at 194.

Here, even viewing the evidence in the light most favorable to Defendants, no reasonable factfinder could conclude that the AM Employees had sufficient customer interaction to be deemed "customarily and regularly tipped."  Indeed, the Sixth Circuit Court of Appeals has specifically distinguished "off-hour employees" as one category of worker that clearly would *not* qualify as a tipped employee.  *See Kilgore v. Outback Steakhouse of Fla., Inc.,* 160 F.3d 294, 301 (6th Cir. 1998) ("One can distinguish hosts from restaurant employees like dishwashers, cooks, or off-hour employees like an overnight janitor who do not directly relate with customers at all."); *see also Martinez v. Perry's Restaurants Ltd,* 2023 WL 3593167, at *26 n.4 (W.D. Tex. May 22, 2023) (construing the phrase "off-hour" to refer to employees "working when customers are not present"), *report and recommendation adopted* 2024 WL 23181 (W.D. Tex. Jan. 2, 2024).  There can be little debate that the AM Employees fit that descriptor here, where

it is undisputed that they substantially completed their shifts before the Four Locations even opened to guests.

Defendants' counterarguments do not convince the Court that it should find otherwise. They first direct the Court's attention to the current iteration of the United States Department of Labor's ("DOL") Field Operations Handbook ("FOH"), which states: "It is not required that all employees who receive tips from a mandatory traditional tip pool themselves receive tips from customers as long as they work in an occupation recognized as one in which employees customarily and regularly receive tips." FOH § 30d08(c) (2023). Inasmuch as the DOL has specifically recognized bussers[8] as one type of employee that customarily and regularly receive tips, Defendants argue the AM Bussers are a "defined tipped occupation[]." (ECF No. 218 at 31–32 (citing DOL Opinion Letter, 2009 WL 649014, at *1–2 (Jan. 15, 2009)). But this argument, in the Court's view, amounts to little more than an assertion that, because the AM Bussers have the title of "busser," they are categorically tipped employees. And "[l]abels are easily molded to fit a party's goals and cannot be determinative of whether an employee customarily and regularly receives tips." *Montano,* 800 F.3d at 191. Contradictorily enough, Defendants criticize Plaintiffs in the preceding paragraphs for

---

[8] Plaintiffs also set forth facts and evidence in their Statement of Material Facts supporting that the "service well position . . . did not qualify to be paid from the tip pool." (ECF No. 209 at 17–18.) However, the service well position / service well bartenders are thereafter wholly unmentioned in the body of the Motion, and Plaintiffs conclude the Motion by asking the Court to hold only that "Perry's operated an unlawful tip pool in all weeks and at all locations in which AM shift employees were paid using Plaintiffs' tips from the tip pool." (ECF No. 209 at 32.) Thus, it is somewhat unclear to the Court whether Plaintiffs are viewing the service well employees as a subcategory of the AM Employees, or whether their intent was to separately move for summary judgment as to the service well bartenders. To the extent it is the latter, the Court will deny summary judgment as to the service well bartenders considering Plaintiffs' failure to fully develop that argument in the Motion. Of course, Plaintiffs remain free to challenge Perry's inclusion of the service well bartenders in the tip pool at trial.

the very same "impermissibl[e]" approach.  (ECF No. 218 at 31 ("Plaintiffs . . .
impermissibly focus on labels of 'busser,' 'host,' etc.  The FLSA focuses on duties.").)

In a similar vein, Defendants also appear to argue that the AM Employees qualify
as tipped employees because they "are clearly front of house employees."  (ECF No.
218 at 30.)  One could certainly debate Defendants' formalistic definition of "front of
house."  But the Court ultimately need not engage in that debate, as the DOL has very
recently issued an opinion letter analyzing whether "front-of-house oyster shuckers"
qualified to participate in a restaurant's tip pool that it finds illustrative.  DOL Opinion
Letter, FLSA2025-03 (Sept. 30, 2025).  Tellingly, the DOL's consideration of whether
the oyster shuckers customarily and regularly received tips did not begin and end with
the fact that they were, undisputedly, "front-of-house" employees.  Rather, it, too,
observed that, "to be an individual who customarily and regularly receives tips, an
employee must engage in service-related functions and have sufficient interaction with
the customers who leave tips, a portion of which are subsequently contributed to a tip
pool."  *Id.* at 3.  In ultimately concluding that the oyster shuckers were customarily and
regularly tipped employees, the DOL's analysis focused on the fact that they "directly
service[d] the customers by sharing and detailing oyster offerings to customers, making
suggestions to customers regarding oyster offerings, and fielding questions about the
different options" and "prepare[d] the oysters in plain view of the restaurant's
customers."  *Id.* at 4.  Point being, the fact that the AM Employees may, in a technical
sense, work in the "front of the house" is not the dispositive inquiry.

Defendants also argue that the AM Employees *did* have more than *de minimis*
interactions with customers sufficient to qualify them as customarily and regularly

tipped.  For instance, they contend the "AM Bussers did not work exclusively when the restaurant was closed" but were instead "often the customers' initial points of contact who came into the restaurant for inquiries, or who were seated early before the restaurant's advertised opening time" and "worked into the early part of dinner service . . . ."  (ECF No. 218 at 30; *see also* ECF No. 218 at 20 ¶ 71 (asserting that, in at least 837 of the 3,400 shifts identified by Plaintiffs, employees clocked out after the advertised opening time of 4:00 p.m.); ECF No. 218-1 at 2136 (attesting that customers at the Alabama location "often come in" between 1:00 and 4:00 p.m. "to buy gift cards, make reservations, look at rooms for private events . . . collect items they left the night before," etc.).)  But Defendants have not adduced any specific evidence that persuades the Court there is a genuine issue of material fact as to whether these opportunities for direct customer interaction were more than occasional.  And "occasional[] [] limited contact with customers" does not a "customarily and regularly tipped" employee make. *Mould v. NJG Food Serv., Inc.,* 37 F. Supp. 3d 762, 700 (D. Md. 2014); *see also Montano,* 800 F.3d at 192–93 (an employee "who occasionally responds to customer requests and has minimal presence in the dining room setting up glasses likely is not a tipped employee").

Similarly, Defendants argue that AM Hosts "routinely interacted with customers either in person or over the phone," particularly to the extent one of their "primary duties" was to "confirm and take reservations."  (ECF No. 218 at 33.)  But here again, Defendants have not adduced any specific evidence of the frequency with which these phone calls occurred that persuades the Court there is a genuine issue of material fact as to whether the AM Hosts had more than *de minimis* customer interaction.  For that

matter, nor is the Court persuaded that a phone call to confirm a customer reservation even amounts to customer interaction.  "The *Montano* customer interaction test contemplates customers receiving a service and tipping for that service."  *Paschal v. Perry's Restaurants Ltd.,* 2025 WL 3215363, at *9 (W.D. Tex. Nov. 10, 2025).  Like the district court in *Paschal,* this Court, too, finds it "implausible . . . that someone who made a reservation, but who has yet to walk into Perry's, much less be seated or receive customer service, would have any incentive to leave a tip during an interaction over the phone with a Perry's staff member during which they simply confirm their reservation."  *Id.*

Lastly, Defendants point to the fact that, "[o]f the alleged 3,400 AM shifts, at least 140 shifts occurred while a private lunch party was taking place at one of the Four Locations . . . ."  (ECF No. 218 at 21.)  Even assuming these private lunch events presented opportunities for AM Employees to provide direct customer service, which Plaintiffs dispute (ECF No. 221 at 19), the fact that private lunch events took place 4% of the time—or roughly one to three times a month at each location, with increasing frequency around the holidays (ECF No. 218-1 at 10 ¶ 17; 2123 ¶ 16, 2129 ¶ 18, 2136 ¶ 15)—also cannot support a finding of more than *de minimis* customer interaction.  *Cf. Montano,* 800 F.3d at 194 (observing that customer interaction on "one occasion per week" was "only de minimis interaction").

At bottom, as a matter of law and logic, employees who work morning shifts at a restaurant while it is closed to guests cannot have more than *de minimis* customer interaction sufficient to qualify them as "customarily and regularly tipped" employees. For this reason, the Motion is granted to the extent that the Court finds, as a matter of

law, the AM Employees are not "customarily and regularly tipped" and their inclusion in

the tip pool violated the FLSA and Colorado Wage Laws.  PRL's ultimate liability, of

course, remains subject to the Court's determination at trial of whether it is an

"employer" under the FLSA.

**C.    Failure to Provide Notice of Tip Sharing to Customers**

As a final point, Plaintiffs argue that the tip pool at the Colorado Location was

unlawful for the "independent reason" that Defendants "failed to comply with the notice

requirements of the CWCA . . . ."  (ECF No. 209 at 32.)  The CWCA specifically

provides that

> [i]t is unlawful for an employer engaged in a business where
> the custom prevails of the giving of gratuities by patrons to
> an employee of the business to assert a claim to, or right of
> ownership in, or control over gratuities.  These gratuities are
> the sole property of the employee *unless the employer
> notifies each patron in writing, including by a notice on a
> menu, table tent, or receipt, that gratuities are shared by
> employees.* . . .

C.R.S. § 8-4-103(6) (2019) (emphasis added).

"PSC concedes [that] it did not have a customer-facing tip pool notice" at the

Colorado Location "[f]rom August 2, 2019 until May 2024."  (ECF No. 218 at 28.)  But

Defendants continue: "Regardless, PSC employees received at least the full Colorado

minimum wage in total pay for every shift worked."  (*Id.*)  It is unclear to the Court

whether Defendants are intending to argue there is no employer liability for failure to

comply with the CWCA's tip share notice requirement where employees nevertheless

receive "at least the full Colorado minimum wage."  If so, they direct the Court to no

authority to support this position, and the Court otherwise discerns no language in the

statute suggesting that an employer is only liable for noncompliance with its notice

provisions if its employees receive less than the minimum wage.

Accordingly, the Motion is granted to the extent that the Colorado Plaintiffs are entitled to summary judgment that Perry's failure to provide notice to customers of its tip sharing policy between August 2019 and May 2024 was a violation of the CWCA.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS that:

1.      Plaintiffs' Motion for Partial Summary Judgment (ECF No. 209) is DENIED to the extent that the Court FINDS it is a disputed issue of fact whether PRL is an "employer" under the FLSA and Colorado Wage Laws.

2.      Plaintiffs' Motion is GRANTED to the extent that the Court FINDS:

a.      PSC and, to the extent it is found to be an "employer" at trial, PRL's distribution of tip pool funds to the AM Employees violated the FLSA and Colorado Wage Laws because the AM Employees were not "customarily and regularly tipped" as a matter of law; and

b.      PSC and, to the extent it is found to be an "employer" at trial, PRL's failure to provide notice to customers from April 2019 to May 2024 that employees at the Colorado Location shared tips was a violation of the CWCA as a matter of law.

3.      This case **REMAINS SET** for a Final Trial Preparation Conference on **March 6, 2026** in Courtroom A801 at **2:00 p.m.,** and a 5-day bench trial to commence on **March 23, 2026**.

Dated this 3rd day of February, 2026.

BY THE COURT:

William J. Martinez
Senior United States District Judge